FANNIE WYATT v. THE STATE.

No. 15049. Delivered March 23, 1932.

4

The opinion states the case.

*Wm. McMurray,* of Cold Spring, for appellant.

*Lloyd W. Davidson,* State's Atttorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—Aiding a prisoner to escape is the offense; penalty assessed at confinement in the penitentiary for a period of two years.

The state's testimony was in substance as follows: J. P. Counts, a constable in San Jacinto county, had a warrant issued by the justice of the peace to arrest Charlie Hines, who was charged with perjury. From Counts' testimony we quote: "On the morning of August 15, I seen Charlie Hines about a mile this side of his home and I had two warrants of arrest at the time. * * * I told him I had two warrants of arrest for his arrest to be at court that morning, his case was set for 10 o'clock, to have examining trial, to set a bond and be ready for district court, and he asked me, he was not presentatble to come to court and if I would let him go home and change clothes he would meet me at 10 o'clock. I said, 'Charlie, if I let you go, I don't want you to put me to no trouble', and he says, 'I will be there at 10 o'clock.' "

Hines failed to appear at the time designated, and about 3:00 or 3:30 o'clock in the afternoon of the same day, Counts went to the home of Hines. Observing Hines in his field, Counts went to the fence and called him:

"I had two warrants for his arrest and to get out and go to the court so he could have the examining trial and prepare his papers for district court. He stood still. I told him the second time and he did not; I told him the third time to get out and he still stood there. He said, 'I am all right where I am; I am not going nowhere.' I said, 'You will have to go and prepare the papers.' * * * He still stood there and I told him a half-dozen times to get out and get in the truck, and he refused to obey and was still standing there. I got through the fence just below him, and after I got inside the fence I said, 'Charlie, I told you to go and get in the truck.' And when I told him that, there was a stick sticking through under the wire. I reckon it was six feet from him, and I was

closer to the stick than he. He sort of stooped towards the stick like he was going to get the stick. Anyhow, I grabbed the stick in the left hand and at the same time pulled the pistol. When I pulled the pistol, I kicked him to get through the fence and he got through the fence. And I got through the fence behind him, and by the time I got through, Leona Hines, the wife of Charlie Hines, and Fannie Wyatt come running up.

"When Charlie Hines did get through the fence he got through cursing. He says, 'Mr. Jim, if you hit me with that stick or kick me again, we are going to have hell here.' Then, either Leona Hines or Fannie Wyatt, went and called to Pink Hines, and he came running. Fannie Wyatt was a sister of Charlie Hines. Pink Hines was his father.

"After they had run up, I told Charlie I had a warrant of arrest for him and to get in the truck so we could go to court. I had the warrant in my hand. When I went to get through the fence, I threw the stick on the outside. I said, 'Charlie, I have got two warrants for your arrest; you get in the truck and let's go to court.' He says he wants to go down and talk to his daddy. He said, 'You get in the truck and turn and come on, I will walk down', and I said, 'No, I will walk with you.'

"We went on down the road, and the defendant Fannie Wyatt, Leona Hines, Pal Wyatt, and Earl Wyatt, all started down the road. When we got in front of Charlie Hines' home, he said something to his wife which I did not understand.

"We went to Pink Hines' house. We got something like fifty feet of Pink Hines' house, and he come out and said, 'What in the hell is this fuss going on about?' I said, 'Nothing, Pink, but I have two warrants of arrest for Charlie Hines in the Reece Johnson and Tom White pistol case and I have come to arrest and carry (him) to court, and he says he wanted to talk to you, and I have brought him to talk to you.' Pink said, 'I am getting damned tired the way this thing is going on.'"

By that time Jennie Hines and Willie Hines came running. Counts saw a pistol in the possession of Leona Hines, wife of Charlie Hines. The officer demanded the pistol. When he did that, the whole bunch (Fannie Wyatt, Pink Hines, Charlie Hines, Jennie Hines and Willie Hines) rushed between Counts and Leona Hines and said, "No, you are not going to search her." Again quoting from the officer: "Pink Hines said, 'Hell, no, you are not going to search her. She has got nothing.' The whole bunch cursed and said I could not search her; that I had no right to search her. I made two or three different attempts to get to her, and every time the whole bunch kept springing between me and her, and at the same time Lily Hines was standing something like fifty feet from me on Pink Hines' porch with a double-barreled shotgun. * * *

"I said, 'Charlie, this is my last time, are you going?' Pink Hines says, 'Hell no, he is not going.' And Charlie Hines says, 'No, by God, I am not going', and Jennine Hines spoke up and says, 'No, son's not going

this time or the next time, and you need not come back after him; he is not going now or no other time.'

"Counts then said, 'I will go to see about this, and see the officers and we will attend to it later.'"

We gather from the record that Charlie Hines voluntarily surrendered and was placed in jail. Other state's witnesses put a different color upon the conduct of Charlie Hines, from those present at the time of the altercation, but in no sense strengthened the state's case, as developed from the testimony of Counts, but tended to controvert some of his testimony.

The record contains a number of bills of exception and criticisms of the court's charge, a discussion of which will be pretermitted for the reason that, as viewed by the court, a discussion of the evidence upon which the conviction is based alone requires consideration.

The offense is defined in article 329, P. C., which reads as follows: "Whoever wilfully aids in the escape of a prisoner from the custody of an officer by whom he is legally held in custody on an accusation of felony, by doing any act calculated to effect that object, shall be confined in the penitentiary not less than two nor more than seven years; and if, in aiding in the escape, he shall make use of arms, he shall be confined in the penitentiary not less than two nor more than ten years."

Actual escape of a prisoner is not essential to complete the offense charged. P. C., art. 337.

The prosecution is founded upon the averment that Charlie Hines was then and there legally held in custody and that the appellant's action was calculated to effect the escape of the said Charlie Hines from custody. Proof of custody of the alleged prisoner was essential to a conviction.

In Tex. Jur., vol. 4, p. 739, sec. 2, and p. 792, sec. 34, the following statements are found: "Arrest on a criminal charge has been defined as 'the apprehending or detaining of the person in order to be forthcoming to answer an alleged or suspected crime.' In general terms this definition bears a close resemblance to the description of arrest in civil proceedings. In both criminal and civil cases there is a detaining of the person of the party apprehended and a deprivation of liberty.

"The general definition of the word 'arrest' includes 'to stop,' 'to seize,' or 'to deprive one of his liberty, by virtue of legal authority'—and also 'the apprehension of a person by virtue of lawful authority, to answer to the demands against him in a civil action.'"

From Cyc. of Law & Proc., vol. 3, p. 873, the following quotation is taken: "To constitute an arrest it is necessary that the officer should assume custody and control over the party, either by force or with his consent, and it has been held that neither the utterance of words indicating an intention to arrest on the part of the person uttering them, nor the reading of the warrant is of itself sufficient."

The statute under which the prosecution is laid has been a part of the

law of the state since the first code was written. We have been unable to find any instance in which there has been a conviction sustained for the violation of the statute. Most of the instances in which the subject of arrest has come under investigation in a criminal prosecution are cases in which there has been a homicide committed or violence used in resisting an arrest. The case of Rezeau v. State, 95 Texas Crim. Rep., 325, 254 S. W., 574, is of that nature.

As applied to the facts in the present instance, it seems apparent that the officer did not at any time have Hines in custody or under his control; nor did the appellant at any time submit to an arrest. The officer claimed to have had a warrant but so far as shown by the record, it was never exhibited to Charlie Hines. The only time that Counts appears to have been in close contact with Charlie Hines was at the time that Hines was kicked by the officer and the latter drew his pistol. Hines then remonstrated with the officer and some of the relatives of Hines, perhaps including the appellant, appeared. No act of violence by the appellant is shown. After the officer drew his pistol and kicked Charlie Hines, the appellant, Fannie Wyatt, used abusive language toward the officer. When the officer commanded Charlie Hines to get in the truck, he refused to do so, but declared his intention to go and talk to his father. When Hines proceeded to do so, the officer followed or accompanied him. In the transaction, there may have been some offense committed, by the appellant, but if so, we are unable to conclude that it was the offense with which she was charged and of which she has been convicted.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*